IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOHN SMYLIE, | § | |
| *Plaintiff,* | § § § | 5:25-CV-01149-OLG-RBF |
| vs. | § § | |
| KAREN LEE, E-MARKET PRO, A GENERAL PARTNERSHIP; AND JOHN DOES 1-20, | § § § § | |
| *Defendants.* | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando Garcia:**

This Report and Recommendation concerns Plaintiff John Smylie's Motion for *Ex Parte* Temporary Restraining Order and Authorizing Expedited Discovery. *See* Dkt. No. 5 (Mot. or Motion). The District Judge referred all pretrial matters for resolution, pursuant to Rule CV-72 and Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 6. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, Plaintiff's Motion, Dkt. No. 5, should be **GRANTED.**

**Factual and Procedural Background**

In February 2025, the complaint alleges, Plaintiff John Smylie was contacted by Defendant Karen Lee via Instagram. Dkt. No. 1 (Compl.) ¶ 11. Smylie and Lee began regularly communicating over WhatsApp, an encrypted messaging platform. *Id*. Lee introduced Smylie to an investment and crypto-currency trade platform referred to as "E-Market Pro." *Id*. ¶ 12. Lee

claimed to have made significant profits on E-Market Pro and encouraged Smylie to make an account. *Id*. Over months, Lee purported to train Smylie in using the platform and provided him with asset-transfer instructions to deposit money into his account. *Id*. ¶ 13. Each time Smylie completed an asset transfer, his account balance on the E-Market Pro interface would correspondingly increase. *Id*. Lee also purported to have made several large deposits into Smylie's account herself as well. *Id*.

Smylie's balance on E-Market Pro exponentially grew, displaying assets worth more than $900,000. *Id*. ¶ 14. But when Smylie attempted to withdraw his funds, E-Market Pro prohibited him from doing so. *Id*. Some months later, Lee claimed that Smylie would be permitted to unlock his account with a final transfer of $135,000 and induced Smylie to transfer $10,000, promising that she would furnish the remaining $125,000. *Id*. ¶ 15. When Smylie transferred the $10,000, Lee refused to wire her portion. *Id*.

Smylie alleges causes of action against Defendants Karen Lee, E-Market Pro, and unknown John Does for racketeering in violation of 18 U.S.C. § 1964(c) as well as common law conversion and fraud. *See* Compl. ¶¶ 19-30. Smylie seeks the following relief: imposition of a constructive trust over his stolen assets and return of those assets; monetary damages; statutory trebled damages pursuant to 18 U.S.C. § 1964; punitive damages; costs, including attorneys' fees under 18 U.S.C. § 1964(c); pre- and post-judgment interest; and injunctive and equitable relief as required to preserve assets for recovery and halt Defendants' allegedly unlawful acts. *Id*. ¶ 32. After retaining counsel, Smylie engaged a blockchain-investigations firm to perform blockchain tracing—the process of using publicly available data and specialized software to follow digital assets from location to location on the blockchain. *See* Dkt. No. 5-1 (hereinafter referred to as "Cole

2

Affidavit") ¶ 20. The investigator traced Smylie's purportedly stolen assets to the following addresses associated with the OKX cryptocurrency exchange. Mot. at 7.

| *Destination Addresses* | *Amount Traced* |
|---|---|
| 0x16076e44ba20c667a59e044ac0501e87059baf28 | $208,989 |
| 0xfaa2b0384e4c9ea037109316a1dfa08831345cbb | $33,190 |
| 0x92AE28AF01804Dc7ee1806311DC143618eBf899B | $8,311 |

Immediately after filing this action, Smylie sought (1) an emergency *ex parte* temporary restraining order to temporarily freeze Defendants' accounts and assets associated with certain addresses at the OKX cryptocurrency exchange and (2) an order authorizing expedited discovery. *See* Mot.

**Analysis**

**A.     Plaintiff Smylie Satisfies the Procedural and Substantive Requirements to Warrant Issuance of an *Ex Parte* Temporary Restraining Order.**

The issuance of an *ex parte* temporary restraining order (TRO) typically requires procedural and substantive showings. Procedurally, the Court may issue a temporary restraining order *ex parte* when (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(A)-(B). Substantively, a movant must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction [is] not issue[d]; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an

3

injunction is in the public interest." *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017) (per curiam).

    **1.** *Smylie has provided sufficient facts that show immediate risk of irreparable harm and Smylie's counsel certifies that notice to Defendants should not be given.* First, Smylie's Verified Complaint, the Cole Affidavit, and the blockchain-tracing report provide "specific facts" that "clearly show that immediate and irreparable injury, loss, or damage will result." *See* Fed. R. Civ. P. 65(b)(1)(A). Smylie's Complaint suggests that he was indeed a victim of a common cyber-scam, induced to invest assets and deposit money in E-Market Pro that he is now unable to withdraw. *See* Compl. ¶¶ 4, 14, 17. Smylie's investigator attests and details the prevalence of such scams, relying on significant experience investigating similar cases, as well as the FBI's most recent cybercrime report, "which shows that more than forty thousand Americans reported losing more than $5.8 billion in losses to pig-butchering scams in 2024 alone." Mot. at 2 (citing Federal Bureau of Investigation Internet Crime Complaint Center, *2024 Internet Crime Report*, p. 36) (emphasis removed); Cole Affidavit ¶¶ 3-7. The Cole Affidavit provides further background into these so-called pig-butchering scams to elucidate the particularly acute risk of immediate and irreparable harm. *Id*. ¶¶ 3-7. The Cole Affidavit details how, "even where a victim's assets can be traced to identifiable cryptocurrency exchanges that would cooperate with freezing orders, those assets could be further dissipated at any moment via transfer to non-compliant exchanges." *Id*. ¶ 23. Accordingly, once Smylie's allegedly "stolen assets have been dissipated in this way, recovery becomes highly unlikely, if not practically impossible." *Id*.

  Second, Smylie's attorney, Marshal Hoda, certifies in writing why notice should not be required under the circumstances. *See* Dkt. No. 5-2 (hereinafter referred to as "Hoda Affidavit"). Initially, Hoda attests that perpetrators consolidate stolen assets from many victims into accounts

at cryptocurrency exchanges. *Id.* ¶ 5. These well-established exchanges, according to Hoda, will generally comply with freezing orders issued by U.S. Courts. *Id*. But Hoda avers that perpetrators of pig-butchering scams "use every tool available . . . to place the assets they steal . . . beyond the reach of the U.S. Courts[,] [a]nd they do everything they can to destroy evidence before it can be obtained by law enforcement or victims' attorneys." *Id*. ¶ 4. As such, the consolidation of victims' assets at compliant exchanges is only temporary, as these perpetrators will typically either "transfer the stolen assets to non-compliant 'rogue' exchanges where they cannot be frozen," exchange the stolen assets for fiat currencies and withdraw those assets to bank accounts in other countries, or "further transfer the stolen assets to self-custody addresses where . . . they cannot be frozen." *Id*. ¶ 5. In sum, according to Smylie, if Defendants were provided notice, "they would immediately empty the targeted cryptocurrency exchange accounts." Mot. at 11. Other courts within the Fifth Circuit have issued an *ex parte* temporary restraining order under similar circumstances. *See, e.g., Cohn v. Popescu*, 1:24-cv-337-MJT, 2024 WL 4525511, at *2 (E.D. Tex. Aug. 16, 2024).

Smylie has provided sufficient facts to demonstrate that immediate and irreparable injury, loss, or damage will result before Defendants can be heard in opposition, and Smylie's counsel has certified in writing that notice should not be required because Defendants may dissipate assets obtained unlawfully beyond the reach of this Court's jurisdiction. As such, Smylie has satisfied the procedural elements required to obtain an *ex parte* TRO.

Moreover, the evidence provided and arguments offered demonstrate that security for the TRO is not warranted. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (noting that requirement for security for TRO is in the sound discretion of the Court). If the TRO is later determined to be unwarranted, Defendants can move the Court to unfreeze the assets in question.

**2.** *Smylie has met the substantive requirements to justify the imposition an ex parte TRO.* Having found that Smylie satisfied the procedural requirements to justify the issuance of a TRO *ex parte*, Smylie must provide evidence to satisfy the substantive elements which include: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction [is] not issue[d]; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Moore*, 868 F.3d at 402-03. The Court addresses each requirement in turn.

***Plaintiff Smylie has established that he is likely to succeed on the merits of his claims.*** Smylie makes claims against Defendants for violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), as well as claims of common law conversion and fraud. Compl. ¶¶ 19-30.

To succeed in a civil RICO claim, a plaintiff must show (1) a violation of 18 U.S.C. § 1962 ("RICO violation"), (2) an injury to his business or property, and (3) that the RICO violation caused this injury. *Lewis v. Danos*, 83 F.4th 948, 956 (5th Cir. 2023). To prove a RICO violation, a plaintiff must demonstrate that the defendant is a person engaged in a pattern of racketeering activity, connected to the acquisition, establishment, conduct, or control of an enterprise. *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228-29 (5th Cir. 2003) (citations omitted). Here, Smylie provides evidence that Defendants engaged in a common cybercrime known as a "pig-butchering scam." Compl. ¶¶ 19, 20; *see also* Cole Affidavit ¶ 10. Smylie's Complaint provides detailed factual allegations as to how Smylie was deceived into using this platform by Defendant Karen Lee, an individual with whom he developed a professional and collegial relationship with, and how he was ultimately induced to send significant financial assets valued at $254,173 to the E-Market Pro platform. Compl. ¶¶ 4, 12-14. Smylie's Complaint also attests to the common purpose

to defraud, and the continuous pattern of fraudulent activity. Comp ¶¶ 13, 15, 24. And, as a result of Defendants' cyber scam and alleged RICO violation, Defendants stole significant financial assets from Smylie, causing him injury. Compl. ¶¶ 4, 13, 25. As such, Smylie's RICO claim is likely to succeed on the merits.

Under Texas law, "[c]onversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 386 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citation omitted). Smylie's Complaint and the Cole Affidavit suggest that, as is common in this type of scheme, Defendants E-Market Pro and Lee intentionally induced Smylie to make several asset transfers to the E-Market Pro interface. Compl. ¶¶ 13-15; Cole Affidavit ¶ 17. Thereafter, Defendants took control of Smylie's assets, ultimately prohibiting him from withdrawing any funds. Compl. ¶¶ 12-14, 27. Thus, Smylie is likely to succeed on the merits of his claim for conversion.

To prevail on a fraud claim under Texas law, a plaintiff must show that "(1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury." *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019); *see also Wesdem, LLC v. Il Tools Work, Inc.*, 70 F.4th 285, 291 (5th Cir. 2023). Smylie's Complaint indicates that Defendants—intentionally and with knowledge of the falsity—represented that E-Market Pro was a valid and legitimate cryptocurrency trading platform. Compl. ¶ 13. And after Defendants prohibited Smylie from accessing his account, Defendants represented that Smylie could unlock his account by making a subsequent transfer. *Id*.

¶ 16. Smylie's Complaint further attests that he indeed relied on such representations to his detriment as Smylie made numerous asset transfers totaling $254,173. *Id.* ¶¶ 4, 13, 15.

In sum, Smylie has produced evidence that Defendants intentionally misappropriated his assets in what appears to be an intentional cyber-scam. The similarities between Smylie's allegations and that of the well-known "pig butchering scam" strongly suggest that Smylie was indeed a victim of the same scheme, and will ultimately prevail on these claims once a full record is developed.

The Court notes that generally, when a money judgment is sought, a court may not enter an order freezing a defendant's assets unless a final judgment has been entered. *See Grupo Mexicano de Desarrolo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). But as noted by Smylie, some district courts have declined to apply this general rule when a plaintiff seeks equitable relief in the form of a constructive trust placed over traceable stolen assets. *See* Mot. at 18 (citing *Yogaratnam v. Dubois*, No. 24-cv-393, 2024 WL 758387, at *3 (E.D. La. Feb. 23, 2024)); *see also Cohn*, 2024 WL 4525511, at *3. Thus, to obtain the requested relief, Smylie must also demonstrate that a Court is likely to authorize the imposition of a constructive trust.

To obtain a constructive trust under Texas law, a party typically must show: (1) "a breach of a fiduciary relationship or, in the alternative, actual fraud"; (2) "unjust enrichment of the wrongdoer"; and (3) "tracing of the property to an identifiable res." *Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 437 (5th Cir. 1994); *see also Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir.1980) (holding that, under Texas law, a constructive trust can attach only "to some identifiable property which can be traced back to the original property acquired by fraud") (citation omitted). Smylie's Complaint and the Motion indicate that the above elements are likely met. For the reasons previously detailed, Smylie has demonstrated likely success on the merits of his claim for fraud.

The alleged scammers would be unjustly enriched if they could profit from their scheme. And Smylie's assets are specific, identifiable, and traceable property. Indeed, the assets have been traced to three specific accounts controlled by Defendants at OKX cryptocurrency exchange. *See* Mot. at 7. Furthermore, several district courts within the Fifth Circuit have justified the issuance of an *ex parte* temporary restraining order in similar cases because of the requested constructive trust. *See e.g.,* Cohn, 2024 WL 4525511, at *2; *see also e.g.*, Order Granting Temporary Restraining Order and Authorizing Expedited Discovery at Dkt. No. 7, *Harris v. Upwintrade et al.*, No. 1:24-cv-313-MJT, at *9-10 (E.D. Tex. Aug. 8, 2024).

In light of Texas courts' recognition of the imposition of a constructive trust, and Smylie's evidence that a constructive trust is likely appropriate when as here, the scope of the freeze is limited both in scope and duration, Smylie has demonstrated likely success on the merits to justify the issuance of an *ex parte* TRO.

***Smylie has demonstrated that absent a restraining order, irreparable harm would result.*** As previously stated, Smylie's Complaint and the Cole Affidavit detail how Smylie's assets were purportedly stolen and how quickly they can be transferred to unretrievable locations. *See* Cole Affidavit ¶¶ 22, 23. Thus, Smylie has provided sufficient facts to demonstrate that immediate and irreparable injury, loss, or damage will result absent the imposition of an order temporarily freezing Defendants' assets.

***The threatened injury to Smylie outweighs the potential harm that Defendants may suffer as a result of the accounts being frozen***. Smylie purports to have sent $254,173 to E-Market Pro, *see* Compl. ¶¶ 4, 13, 15, the majority of which can be traced to three OKX deposit addresses. Mot. at 20. Maintaining the assets at these deposit addresses may be Smylie's only realistic opportunity to recover this lost sum. In contrast, as a result of the imposition of a

9

restraining order, Defendants will suffer a *temporary* inability to move such assets. Such a restraint can be dissolved later on. *See Jacobo v. Doe*, No. 1:22-cv-672-DAD-BAK, 2022 WL 2052637, at *6 (E.D. Cal. June 7, 2022) (finding "[a] delay in defendant's ability to transfer the [allegedly stolen] assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court"); *see also Light v. Ling,* No. 3:23-cv-1018, 2023 WL 4504585, at *3 (N.D. Tex. June 20, 2023). In evaluating these interests, the potential damage to Smylie significantly outweighs any injury that Defendants might suffer.

***The issuance of a restraining order freezing Defendants' targeted accounts serves the public interest***. Smylie's evidence shows that the devastation caused by the "pig-butchering epidemic" is vast. *See* Mot. at 5. ("Last year, the FBI received 41,557 reports of cryptocurrency-related investment fraud. These victims collectively reported $5.8 billion in losses in 2024 alone.") (internal citations omitted) (emphasis removed). The issuance of a freezing order will serve the public interest by assuring both victims of such crimes and "the public that courts will take action to promote . . . recovery of stolen assets when they can be readily located and traced to specific locations." Mot. at 17 (citing *Jacobo*, 2022 WL 2052637, at *6). Further, such an order will prevent the alleged scammers from benefiting and profiting from their scheme.

For the foregoing reasons, it is recommended that Plaintiff Smylie's Motion for *Ex Parte* Temporary Restraining Order requesting the deposit addresses at OKX cryptocurrency exchange be temporarily frozen be **GRANTED** and that no security be required for the TRO.

**B.  Good Cause Exists to Justify Plaintiff Smylie's Request for Expedited Discovery to Serve Limited Subpoenas.**

Generally, parties "may not seek discovery . . . before the parties have conferred as required by Rule 26(f)." Fed. R. Civ. P. 26(d)(1). But expedited discovery before a Rule 26(f)

conference is permitted "when authorized . . . by court order." *Id*. Courts often use "either a preliminary-injunction-style analysis or the good cause standard to determine whether a party is entitled to conduct expedited discovery." *Stockade Cos., LLC v. Kelly Restaurant Grp., LLC*, No. 1:17-cv-143-RP, 2017 WL 2635285, at *2 (W.D. Tex., June 19, 2017) (internal citations and quotations omitted). The Fifth Circuit has not officially adopted either the preliminary-injunction standard or the good cause standard explicitly. But many district courts within the Fifth Circuit have used the good cause standard to determine when to exercise their authority to order expedited discovery. *See e.g.*, *id.*; *see also Document Operations, L.L.C. v. AOS Legal Techs., Inc.,* No. 20-20388, 2021 WL 3729333, at *4 (5th Cir. Aug. 23, 2021) (per curium) ("In the Southern District of Texas—where this case originated—courts employ a good cause standard to determine when to exercise their authority to order expedited discovery.") (citation omitted).

To determine whether good cause exists, courts consider several factors including: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Stockade Cos.*, 2017 WL 2635285, at *2 (quoting *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011)).

Many courts, including other district courts in this Circuit, have authorized expedited discovery from cryptocurrency exchanges in cases with allegations like Plaintiff Smylie. *See e.g.*, *Cohn*, 2024 WL 4525511, at *5-6; *see also* Order Granting Temporary Restraining Order and Authorizing Expedited Discovery at Dkt. No. 7, *Harris v. Upwintrade et al.*, No. 1:24-cv-313-MJT, at *9-10. In similar cases, these courts held that Defendants' privacy interests in protecting their identity "is outweighed by the need to adjudicate victims' claims against them." *Cohn*, 2024

11

WL 4525511, at *4 (citing *Gaponyuk v. Alferov*, No. 2:23-cv-1317-KJM-JDP, 2023 WL 4670043, at *4 (E.D. Cal. July 20, 2023)).

Smylie's requested discovery is sufficiently narrowed. Smylie's requested discovery arises from the pre-suit investigation and blockchain tracing performed by his investigator that identified third parties "likely to be in possession of information about the Defendants." Mot. at 20-21; Cole Affidavit. ¶¶ 24, 26. Smylie requests authorization to issue third-party subpoenas to the following entities.

| *Subpoena Target* | *Connection to Case* |
|---|---|
| Alphabet, Inc. | Alphabet is the parent company of Google. Lee is alleged to have used a gmail.com address. The registrant for E-Market Pro, LLC, also provided a gmail.com address in the course of registering the business entity. |
| Meta Platforms, Inc. | Meta owns several social media platforms including Facebook, Instagram, and Threads. Lee is alleged to have Facebook, Instagram, and Threads accounts. |
| WhatsApp LLC | WhatsApp is the messaging service that Lee allegedly used to communicate with Smylie. |
| Gname Pte. Ltd. | Gname is the domain registrant for e-marketpro.llc, E-Market Pro's web domain. |
| Cloudflare, Inc. | Cloudflare provided domain name services and email servers to e-marketpro.llc. |
| Aux Cayes Fintech Co. Ltd. d/b/a/ "OKX" | Smylie has submitted evidence showing that substantially all of his purportedly stolen assets were deposited in three deposit accounts at OKX. |

Mot. at 20. For all targets, Smylie requests biographical and contact information, IP address and device logs, payment information, and account balances and activities concerning Defendants' accounts. *Id*. at 21. As to payment information, Smylie seeks "only information sufficient to identify the payments provider and the salient account with that provider." *Id*. at 21 n. 64. Smylie also requests that if, as is common in pig-butchering cases, subpoena responses reveal information warranting additional subpoenas to other providers, they be granted the authority to issue

12

subsequent subpoenas seeking the same scope of information outlined above to additional internet-service providers and cryptocurrency exchanges. *Id*. at 21-22.

Also, the burden on the proposed subpoena targets is minimal. Smylie's investigator attests that "[b]usinesses like those operated by the proposed subpoena targets typically maintain such information in databases that allow for straightforward data isolation and export, such that the burden of providing the information requested will be minimal." Cole Affidavit. ¶ 26.

Finally, Courts have authorized similar discovery requests in cryptocurrency-related fraud cases where, like Smylie, Plaintiff was also seeking a restraining order to freeze the assets held in those accounts. *See Cohn*, 2024 WL 4525511, at *5; *see also Strivelli v. Doe*, No. 22-cv-2060-MAS-RLS, 2022 WL 1082638, at *2 (D.N.J. Apr. 11, 2022). For the foregoing reasons, it is recommended that Plaintiff Smylie's Motion for Expedited Discovery be **GRANTED**.

## Conclusion and Recommendation

For the reasons discussed above, it is recommended that Plaintiff's Smylie's Motion *Ex Parte* Temporary Restraining Order and Order Authorizing Expedited Discovery, Dkt. No. 5, be **GRANTED**.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections, responses, and replies must comply with the same page limits as other filings, unless otherwise excused by

the district court's standing orders. *See* Rule CV-7. The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

    **IT IS SO ORDERED**.

    **SIGNED** this 18th day of December, 2025.

_____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE